JUSTICE SHEEHY,
specially concurring:
I have signed the foregoing Opinion, which I agree with in total. I add these additional comments, because while they are not necessarily judicial in tone or approach, they record some vital reasons why the Opinion in this case is necessary.
In Montana, there are three ways to provide coverage for medical expenses and wage loss when workers are injured in their employment. The employer, if it is financially sound enough, may be a self-insurer under Plan I; or an employer may provide Workers’ Compensation coverage by contracting with a private insurer licensed to do business in the state, a method described as Plan II; or a third way to obtain such coverage is for the employer to apply for insurance to the State Insurance Fund, known as Plan III.
A student of government will discern an immediate problem with *53 Plan III: the State Insurance Fund was until 1990 operated by the same agency that is charged with the administration of the Workers’ Compensation Act. The agency had two conflicting duties. It dealt as an insurer, adverse to the injured worker when the State Insurance Fund was concerned; it had to supervise the activities of private insurers and self-insurers, presumably to protect the injured worker, where the State Insurance Fund itself was not concerned.
In the decade of the ’80s, the adversarial attitude of the State Insurance Fund to the worker permeated and carried over into its administration of the rest of the Workers’ Compensation Act. Moreover, the Fund was terribly mismanaged. The result was that many injured workers, in order to obtain official recognition of their rights, have had to hire lawyers to enforce their claims. The insurers, in turn, hired lawyers so that even for the simplest claims the whole business was awash in litigation.
Except for a few notable cases, self-insurers and private insurers seemed to have met the flood of claims without serious financial impairment. The State Insurance Fund, however, became hopelessly mired in financial difficulties. The managers of the State Insurance Fund and the agency found an easy target to blame: it was the lawyers and the courts that were causing all the trouble.
So it was that in 1987, state .employees who were managers of the Division of Workers’ Compensation prodded the legislature into a comprehensive revamping of the Workers’ Compensation laws. S.B. 315 was introduced at the request of Governor Ted Schwinden. The bill became law as Ch. 464, Laws of Montana (1987). Its purpose as far as the courts were concerned is easily extracted from the opening paragraphs which declare public policy, especially this paragraph:
“(3) Montana’s Workers’ Compensation and Occupational Disease Insurance systems are intended to be primarily self-administering. Claimants should be able to speedily obtain benefits, and employers should be able to provide coverage at reasonably constant rates. To meet these objectives, the system must be designed to minimize reliance upon lawyers and the courts to obtain benefits and interpret liabilities. ’ ’
Thus, in childlike simplicity did the legislature purport to remove from the courts their time-honored duty to interpret liabilities.
Amazingly, S.B. 315 cruised easily through the two houses of the legislature. In the Senate, whose 50 members were composed of 25 Democrats and 25 Republicans, that measure passed on third reading by a vote of 44-6. In the House of Representatives, which had 51 *54 Republicans and 49 Democrats, it passed 70-29 with one excused. This, in spite of the fact that the measure stripped the worker of many important protections afforded to him under the old Act. One of those strippings was the requirement that to obtain a lump sum settlement, the injured worker must first have the concurrence of the insurer. Without such concurrence, as the foregoing opinion demonstrates, not only could the worker not get into the courts, he or she was unable even to petition the administration itself for relief, no matter how dire his or her circumstances might be.
In the nearly three years since the adoption of the Act, the effect of the lump sum settlements provision is readily demonstrated. It might be said in favor of the self-insurers and insurers, that they are somewhat more amenable to lump sum settlements than is the counterpart State Insurance Fund. The following table will demonstrate:
Plan I and II (self-insurers and insurers):
Total Settlements Pre-1987 Claims % of Total Post-1987 Claims % of Total
632 535 85% 97 15%
Plan III (State Fund):
Total Settlements Pre-1987 Claims % of Total Post-1987 Claims % of Total
564 538 95% 26 5%
Some of the foregoing disparity with respect to settlements of pre-1987 claims compared to post-1987 claims may be explained by the fact that the post-1987 claims are relatively new and perhaps not yet ready for lump sum consideration. The three years since the Act was adopted, however, indicate that little progress was made toward any lump sum settlements of post-1987 claims. The cardinal reason undoubtedly is that before application for a lump sum settlement can be made, both the insurer and the worker must agree on the amount.
To some degree, the public policy declared in the 1987 legislation to eliminate lawyers and courts has been successful. A number of good lawyers have dropped out of Workers’ Compensation practice because of the stumbling blocks placed in the way of aiding injured workers *55 through lawyers under the revamped Workers’ Compensation laws.
In the three years since the passage of the Act, the management has continued to frighten employers by threats of increased premiums. Hoping to cure a bad situation, the legislature in 1989 separated the State Insurance Fund from the administrative division of the Workers’ Compensation Act. The State Insurance Fund has been converted into the “State Compensation Mutual Insurance Fund.” It is now a “mutual insurance carrier.” Section 39-71-2314, MCA. My information is that the separated carrier, now that it is no longer subject to the wage increase limits imposed on other state employees, immediately granted large wage increases to its managers for now doing the same adversarial job as before. From this management, I suspect, we will find little improvement in the financial crisis, unless that management can saddle employers insured under Plan III with a huge bonded indebtedness, a plan to defer to the future the payment for the sins of the past. Thus, in addition to a 25 % cut in benefits to injured workers, is the panacea devoutly wished for by management.